So Ordered.

Dated: March 5, 2021



Katherine Maloney Perhach
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re:<br>W. Kent Ganske and<br>Julie L. Ganske,<br>                Debtors. | Chapter 11<br><br>Case No. 20-21042-kmp |

**DECISION AND ORDER DENYING DEBTORS' MOTION TO ASSUME
EXECUTORY CONTRACT WITH OTTAWA BARGE TERMINAL, INC.**

The Debtors filed a Motion to Assume Executory Contract with Ottawa Barge Terminal, Inc. (the "Motion") pursuant to 11 U.S.C. § 365. Ottawa Barge Terminal, Inc. ("OBT"), EuroChem North America Corp. ("EuroChem"), Winfield Solutions, LLC ("Winfield"), and the United States Trustee objected to the Motion. The Court held an evidentiary hearing on the Motion on February 11, 2021 and February 12, 2021. At the hearing, the parties agreed that the threshold issue was whether OBT terminated its agreement with Mr. Ganske and several related entities before this bankruptcy case was filed on February 11, 2020. If the agreement was properly terminated before this bankruptcy was filed, then there is nothing for the Debtors to assume in this bankruptcy case. They agreed that the Court should first decide this threshold question before evaluating evidence to determine what amount the Debtors owed OBT, any cure amount, whether the Debtors should assume the agreement, and whether the Debtors could

provide adequate assurance of future performance under the agreement. *See* 11 U.S.C. § 365(b). At the evidentiary hearing, the parties also agreed that Illinois law governs the dispute. The Court limits this Decision and Order to the threshold question.

## **Background**

OBT "operates a canvas type storage facility" along the Illinois River in Ottawa, Illinois. Joint Stipulated Facts, Docket No. 433 at ¶ 2. Its business involves unloading barges and storing product, like fertilizer, coal and salt, before those products are shipped to end users. *Id.* The Debtors own 25% of OBT. *Id.* OBT has filed a proof of claim in this case asserting the Debtors owe $229,538.99. Claim No. 13-1. The Debtors have objected to this figure, both in the Motion and in a claim objection filed on January 21, 2021. They assert OBT owes the Debtors $161,664.25, and after a set off, the Debtors owe $67,873.75. Docket No. 351; Joint Stipulated Facts at ¶ 6.

On or about November 30, 2011, OBT and "WS AG Center and/or Agricultural Consultants" (collectively, "Ganske") entered into a Handling and Storage Lease Agreement (the "Agreement," Debtors' Ex. 1). The Debtors and OBT stipulated that Mr. Ganske functioned in part as a sole proprietor doing business as Agricultural Consultants and thus was a party to the Agreement. Joint Stipulated Facts at ¶ 3. Under the terms of the Agreement, OBT was to "furnish equipment, personnel, and facilities necessary to receive, unload, store and load out" the fertilizer furnished by Ganske at its facility. Debtors' Ex. 1, ¶ 2. The Debtors and OBT described their relationship under the Agreement as follows: "Ganske buys barges of fertilizer and sends them to OBT to unload, store, and act as bailee. To fulfill orders for fertilizer, OBT unloads the fertilizer it has been storing into Ganske's trucks." Joint Stipulated Facts at ¶ 5. The Agreement allowed Ganske to "sublease space to a third party vendor at any time during the term

of this Agreement without prior approval from [OBT]" and Ganske and OBT agreed to treat any such third party fertilizer product stored at the facility under the same guidelines provided in the Agreement. *Id.* at ¶ 3.

The purpose of the Agreement was for OBT to handle and store at least 12,000 tons of fertilizer for Ganske each year. Under the heading "Charges," the Agreement provided,

> For the first 12,000 tons, Warehouseman [OBT] will charge Agricultural [Ganske] $7.50 per ton unloaded and transferred to the Facility and $7.50 per ton loaded out of the Facility.
>
> For any tons after the initial 12,000 tons handled, Warehouseman will then charge Agricultural $5.00 per ton unloaded and transferred to the Facility and $5.00 per ton loaded out of the Facility.
>
> For any tons directly transferred from Warehouseman to any of Agricultural's customers, Warehouseman will charge Agricultural $3.50 per ton.
>
> Agricultural will be held responsible for any demurrage incurred due to scheduling, bunching of barges, or weather conditions making it unable to unload Product.
>
> All barges will be unloaded on a first come first serve basis unless a customer is out of a particular Product.

Debtors Ex. 1, Agreement at ¶ 6. The Agreement does not contain a term governing the timing of payments from Ganske to OBT.

The Addendum to Handling and Storage Lease Agreement, entered on or around November 14, 2014, provided that the Agreement would be in effect "until the effective termination date of November 14, 2024." *Id.* p. 5. It increased some of the charges to Ganske but did not add a term governing the timing of payments from Ganske to OBT. The Addendum did, however, create an exclusive relationship between OBT and Ganske as to the handling of fertilizer:

3

> Exclusivity. Agricultural [Ganske] will be the exclusive tenant for fertilizer products for Warehouseman [OBT] at this Facility. Warehouseman will need the written consent of Agricultural prior to handling any other fertilizer products at this Facility. Both parties understand that this may be in direct conflict with Paragraph 16, Referrals, in the original Agreement. The terms and conditions of this Addendum shall supersede those provisions of the original Agreement.

*Id.*, Addendum, p. 6, ¶ D.

OBT argues that the Agreement, as amended by the Addendum, terminated in December 2019, and accordingly, the Debtors cannot assume the Agreement. In a letter to Mr. Ganske dated December 3, 2019, counsel for OBT wrote,

> Substantial changes of circumstances have developed since entering into the Handling and Storage Lease Agreement and Addendum thereto with the various agricultural entities cited above owned and managed by you. These changes have prompted OBT to provide you notice with this letter that it is terminating its lease with you and the aforementioned agricultural entities.

Debtors' Ex. 4; OBT Exhibit 5. OBT offered two grounds for terminating the contract: (1) Ganske's "fail[ure] to make payments as required by the lease" for the services provided by OBT at the barge facility; and (2) Mr. Ganske's actions relative to his "contractual arrangement with Ameropa" and his actions "relating to the Swiss Singapore matter." *Id.*

## Analysis

### I. Ganske's Failure to Pay Was a Material Breach of the Agreement with OBT.

The main difficulty in determining whether the Agreement was properly terminated by OBT due to non-payment is that neither the Agreement nor the Addendum contains a term governing the time for payment. In the absence of this term, the Debtors argue that Ganske cannot have breached the Agreement at all. OBT counters that this reasoning would lead to absurd results when taken to its conclusion. Ganske could refuse to pay for years and OBT

4

would not have an ability to terminate the contract. It would be required to provide services without receiving payment even if this forced it into its own bankruptcy. Courts are "loath to place a construction upon a contract which would permit one party to receive all the benefits, but deny the payment of the consideration to the other party on the ground that it is indefinite and uncertain." *Pennsylvania Retreading Tire Co. v. Goldberg*, 224 Ill. App. 241, 247 (1922).

The first question is whether the omission of a term governing the time for payment makes the contract unenforceable. "The fact that a contract is incomplete, presents interpretive questions, bristles with unresolved contingencies, and in short has as many holes as a Swiss cheese does not make it unenforceable for indefiniteness." *Haslund v. Simon Prop. Grp., Inc.*, 378 F.3d 653, 655 (7th Cir. 2004). In order for a court to enforce an agreement, the agreement must be sufficiently definite and certain. *Academy Chicago Publishers v. Cheever*, 144 Ill. 2d 24, 29, 578 N.E.2d 981, 983 (1991). "A contract may be enforced even though some contract terms may be missing or left to be agreed upon." *Id*. at 984 (citing *Champaign Nat'l Bank v. Landers Seed Co.*, 165 Ill. App. 3d 1090, 519 N.E.2d 957 (1988); Restatement (Second) of Contracts § 33 (1981)). "Contracts can be shorter and simpler and cheaper when courts stand ready to fill gaps and resolve ambiguities in the minority of contracts that get drawn into litigation." *Haslund*, 378 F.3d at 655. However, "if the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *Academy Chicago Publishers*, 578 N.E.2d at 984.

"A contract 'is sufficiently definite and certain to be enforceable if the court is enabled from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do.'" *Id.* at 983 (quoting *Morey v. Hoffman*, 12 Ill. 2d 125, 145 N.E.2d 644 (1957)); *see also Haslund*, 378 F.3d at 655 ("A

5

contract is rightly deemed unenforceable for indefiniteness when it leaves out (1) a crucial term that (2) a court cannot reasonably be asked to supply in the name of interpretation."). Here, the Agreement and Addendum between Ganske and OBT provide sufficient content for the Court to determine what the parties agreed to do. Indeed, the Agreement was first executed in 2011 and the parties operated under the Agreement until 2019. The contract outlines the responsibilities of each party and contains a method to calculate the amount owed by Ganske to OBT for OBT's services. Thus, the parties had a valid and enforceable contract.

The next step is for the Court to determine the term governing time for payment. "When a contract is ambiguous or silent on a disputed issue," as this one is regarding the time for payment, "a court may, in order to determine the intent of the parties at the time of contracting, consider the contemporaneous or subsequent acts of the parties to the contract." *Vole, Inc. v. Georgacopoulos*, 181 Ill. App. 3d 1012, 1021, 538 N.E.2d 205, 211-12 (1989). Here, the parties already had a relationship since Mr. Ganske was part owner of OBT, so it is perhaps not all that surprising that the parties omitted a term regarding the timing of payment. As one treatise observes, "[i]n informal agreements much goes without saying. When a consumer buys a can of tuna in a grocery store, the terms of the transaction are left to be supplied by law." 2 E. Allen Farnsworth and Zachary Wolfe, Farnsworth on Contracts, § 7.18, at 7-184 (4th ed. 2019).

"Once the court has determined through interpretation that it is faced with an omitted case, it must supply a term to deal with that case. The process by which a court supplies a term is commonly called 'implication' and the resulting term is called an 'implied term.'" *Id.* § 7.19, at 7-192; *see also Academy Chicago Publishers*, 578 N.E.2d at 984 ("[i]t is not uncommon for a court to supply a missing material term, as the reasonable conclusion often is that the parties intended that the term be supplied by implication"); *Austin v. Wohler*, 5 Ill. App. 300, 310 (1879)

6

("Where the parties have left matters material to their rights undisposed of by the express agreement, the law will interpose, and, by implication, supply the terms thus omitted."). A court may determine the implied term by looking to the parties' expectations. *See* Farnsworth § 7.19, at 7-192. If the parties had a shared expectation, the court will imply that term, even if it was not written down. *Id.* "However, if the parties' expectations were significantly different or if one party had no expectation, the court will substitute for the subjective test of shared expectation an objective test of whether one party should reasonably have known of the other's expectation." *Id.*; *see also Kane v. McDermott*, 191 Ill. App. 3d 212, 218, 547 N.E.2d 708, 713 (1989) (time for payment may be supplied by implication and law will imply performance within a reasonable time); *Austin*, 5 Ill. App. at 310 (where promise made but no time specified for performance, the law implies a promise of performance within a reasonable time).

The parties' "intention may also be deduced from a course of performance, course of dealing, or usage." *See* Farnsworth § 7.19, at 7-192; *see also* Restatement (Second) of Contracts, § 202(4). Courts can admit evidence of parties' acts or course of performance to interpret what parties intended as to silent, but essential matters, in contracts. *New York Cent. Dev. Corp. v. Byczynski*, 95 Ill. App. 2d 474, 238 N.E.2d 414 (1968); *see also Keefer Coal Co. of Illinois v. United Elec. Coal Cos.*, 291 Ill. App. 477, 10 N.E.2d 210 (1937) (where contract is ambiguous or incomplete, evidence of the conduct of the parties tending to show their interpretation is admissible to ascertain the true meaning). Furthermore, where the contract is silent or ambiguous as to some matter, the practical construction placed on it by the parties through their subsequent actions is controlling. *Department of Revenue v. Jennison-Wright Corp.*, 393 Ill. 401, 408, 66 N.E.2d 395, 399 (1946) ("There is no more convincing evidence of what the parties intended [by a contract] than to see what they did in carrying out its provisions."); *Chicago &*

7

*Great Eastern Ry. Co. v. Vosburgh*, 45 Ill. 311 (1867) ("It is true, the contract is silent as to which party was to furnish the earth, but the parties themselves gave a construction to the agreement, and they should be bound by it."). It must also be noted that "[a] contract is validly modified if the party which did not propose the changes is shown to acquiesce in the modification through a course of conduct consistent with acceptance." *Maher & Assocs. v. Quality Cabinets*, 267 Ill. App. 3d 69, 78, 640 N.E.2d 1000, 1007 (1994).

Based upon the evidence presented at the hearing, the parties' understanding of the amount of time Ganske had to pay OBT's invoices can be deduced from the parties' course of performance under the Agreement. The evidence demonstrates that OBT had an expectation of being paid in no more than 100 days after the due date of the invoice, OBT repeatedly prompted Mr. Ganske for payment when his account exceeded 100 days past due, and Ganske sent payments in response to those promptings. Despite there not being an express term in the Agreement governing the time for payment of invoices, the parties' course of performance shows that Ganske paid OBT's invoices so that they were no more than 100 days past due.

The invoices sent by OBT to Ganske for the services provided by OBT under the Agreement offer the first glimpse of the parties' understanding as to the timing of payments under the Agreement. The invoices typically provided a payment term of 45 days following the "Ship date." OBT Ex. 3. There was no evidence presented during the hearing that Ganske disputed these invoice terms.

The parties' course of performance related to the timing of payments under the Agreement was further revealed in a number of text messages between Mr. Ganske and Kelly Wiesbrock, one of the other owners of OBT and Mr. Ganske's main contact person at OBT. On November 28, 2017, Mr. Wiesbrock sent a text message to Mr. Ganske asking him whether he

8

had time to talk about accounts receivable guidelines and wanting to get the situation "nailed down this week as it is resulting in too much brain damage from my father." Debtors' Ex. 11 at 2. Mr. Wiesbrock stated that he believed "our only sticking point on the AR piece is related to work stoppage which I think is reasonable at 100 days." *Id.* at 3. Mr. Wiesbrock explained that the issue was the fact that "we never know when we will be paid and the result is constant begging for a check which causes stress and anxiety for my father." *Id.* at 5. During his testimony, Mr. Wiesbrock explained that he sent this text message because OBT was experiencing late payments from Ganske and he wanted clarity on when OBT would get paid. He further described how timely collections on accounts receivable is relevant for a small business like OBT that was struggling to meet its payroll due to the late payments from Ganske. Three days after receiving this text message from Mr. Wiesbrock, on December 1, 2017, Ganske paid $50,000 to OBT as shown on OBT's Customer Balance Detail. Debtors' Ex. 6 at 6. Eight days after receiving this text message from Mr. Wiesbrock, on December 6, 2017, Ganske paid an additional $50,000 to OBT. *Id.*

On July 25, 2018, Mr. Wiesbrock sent another text to Mr. Ganske in which he was "checking in" to see if Mr. Ganske had mailed a check. Debtors' Ex. 11 at 9. He noted that he had just spoken with his dad who was "starting to get worked up." Mr. Ganske replied that he had "sent 50." OBT's Customer Balance Detail shows that five days after receiving this text message from Mr. Wiesbrock, on July 30, 2018, OBT credited Ganske with a $50,000 payment. Debtors' Ex. 6 at 7.

On March 22, 2019, Mr. Wiesbrock sent a text message to Mr. Ganske stating,

> I just pulled your AR info and you have a small one at 102 days
> and another at 99 days, which will obviously put them at 105 and
> 102 days on Monday. If you could bring a check to Mondays

>     meeting for $35k you would be set for a couple weeks. Thanks
>     man.

Debtors' Ex. 11 at 26. Mr. Ganske responded, "I send one, I'm not bringing one" and that he didn't "need the drama." Mr. Wiesbrock replied that "105 days creates its own drama," to which Mr. Ganske responded, "If that's a big deal, I'll drop off a check, and won't bother with the meeting. Then everyone should be happy." *Id.* Mr. Wiesbrock then stated that he "[w]ould like to keep AR under 100 days (which I think is reasonable)." *Id.* at 27. Three days after this text message exchange, on March 25, 2019, OBT's Customer Balance Detail shows that Ganske paid $35,000 to OBT. Debtors' Ex. 6 at 8; OBT Ex. 3 at 1.

Mr. Wiesbrock also testified to a series of emails he sent to Mr. Ganske on behalf of OBT beginning on August 1, 2019 that he credibly described as memorializing his discussions with Mr. Ganske about when OBT could expect payment on the outstanding accounts receivable. In the August 1, 2019 email, OBT offered to "on an exception basis, extend [Ganske's] credit terms under the following conditions: Ag Consultants will pay OBT $122,310.77 on or before August 21, 2019 which would result in all Ag Consultants' accounts receivable to be no more than 99 days past due." OBT noted that this "would provide payment for the following four outstanding invoices":

| Invoice Date | Invoice # | Days past due due on 8/21/2019 | Amount ($) |
|---|---|---|---|
| 04/22/2019 | 492 | 121 | 35,137.76 |
| 04/29/2019 | 496 | 114 | 40,993.66 |
| 05/06/2019 | 500 | 107 | 7,642.20 |
| 05/13/2019 | 504 | 100 | 38,537.15 |
|  |  |  | 122,310.77 |

OBT Ex. 5 at 17. According to this chart, the amount to be paid by Ganske ($122,310.77) represented invoices that would be 100 to 121 days past due as of August 21, 2019.

10

Mr. Wiesbrock testified that he was getting a lot of pressure from the other owners because the invoices were 100 days past due, in essence four months from the time the services were performed by OBT. He noted that OBT was incurring the cost of servicing equipment during that time and paying its employees, but OBT was not getting paid by Ganske. He expressed dismay at how difficult it was for OBT to make its payroll when it was not paid by Ganske for the services provided.

Ganske did not make the payment by the August 21, 2019 deadline. Debtors' Ex. 6 at 8; OBT Ex. 3 at 3. As the August 21, 2019 deadline approached, Mr. Wiesbrock testified that Mr. Ganske told him that he was not going to be able to make the payment, so Mr. Wiesbrock revised the schedule in a second email sent August 21, 2019 that further memorialized his discussions with Mr. Ganske. The email called for payment of $20,000 on or before August 30, 2019, and a second payment of $212,363.93 on or before September 18, 2019, "which would result in all Ag Consultants' accounts receivable to be no more than 99 days old." OBT Ex. 5 at 20. Mr. Wiesbrock included a table in his email outlining the payment schedule as follows:

| Invoice Date | Invoice # | Invoice age (days) on 9/18/2019 | Amount ($) |
|---|---|---|---|
| 04/22/2019 | 492 | 149 | 35,137.76 |
| 04/29/2019 | 496 | 142 | 40,993.66 |
| 05/06/2019 | 500 | 135 | 7,642.20 |
| 05/13/2019 | 504 | 128 | 38,537.15 |
| 05/20/2019 | 507 | 121 | 46,319.43 |
| 05/28/2019 | 513 | 113 | 25,463.00 |
| 06/03/2019 | 515 | 107 | 25,725.65 |
| 06/10/2019 | 518 | 100 | 12,545.08 |
| | | | 232,363.93 |
| Payment to be received by August 30, 2019 | | | (20,000.00) |
| Payment due to OBT by September 18, 2019 | | | 212,363.93 |

*Id.* Ganske did not pay OBT $20,000 by August 30, 2019 or $212,363.93 by September 18, 2019. Debtors' Ex. 6 at 9; OBT Ex. 3 at 4. Ganske did, however, tender payments of $22,000

11

on September 12, 2019 and $20,000 on September 27, 2019. *Id.* Mr. Wiesbrock testified that even with the $42,000 in payments in September, Ganske was 150 days past due on his accounts receivable for work done 30 days prior to that. In other words, OBT had gone six months from the time it performed its services with no payment from Ganske. Mr. Wiesbrock explained how the lack of payments caused OBT to have to borrow money to make its payroll.

Mr. Ganske conceded that he did not make a payment to OBT after September 27, 2019. During his testimony, he asserted that he was paying in the ordinary course of 100-130 days after the invoice was issued and that he continued to do so until the fall of 2019 when he asserted a right to be compensated for operational issues at the barge facility. Mr. Ganske's testimony was not supported by the documentary evidence, which showed that Mr. Ganske did not quantify any alleged damages until December 31, 2019, about a month after OBT terminated the agreement. Debtors' Ex. 2.

On December 3, 2019, counsel for OBT sent a letter to Ganske terminating the Agreement, stating "you have failed to make payments as required by the lease. In particular, you received deliveries and failed to make payments to OBT for those deliveries." Debtors' Ex. 4; OBT Ex. 5. As of the date of the termination letter, Ganske's invoices were up to 218 days past due, which was long past the 100-day payment term dictated by the parties' course of performance under the Agreement. The invoices described in Mr. Wiesbrock's August 21, 2019 email were past due as follows:

| Invoice Date | Invoice Amount | Days Past Due |
|---|---|---|
| 04/29/2019 | $40,993.66 | 218 days past due |
| 05/06/2019 | $ 7,642.20 | 211 days past due |
| 05/13/2019 | $38,537.15 | 204 days past due |
| 05/20/2019 | $46,319.43 | 197 days past due |
| 05/28/2019 | $25,463.00 | 189 days past due |
| 06/03/2019 | $25,725.65 | 183 days past due |
| 06/10/2019 | $12,545.08 | 176 days past due |

12

When the Agreement was terminated, Ganske owed $229,538.00 to OBT.  Joint Stipulated Facts at ¶ 6; Debtors' Ex. 6 at 9; OBT Ex. 3 at 4.  Mr. Wiesbrock noted that after the termination of the agreement, Mr. Ganske made no efforts to bring the accounts receivable current and he avoided Mr. Wiesbrock's texts and phone calls.

Based on the testimony, exhibits, and the parties' course of performance under the Agreement, the Court finds that the parties intended OBT's invoices to be paid no more than 100 days after the due date of the invoice.  The facts showed that 100 days was consistently the marker Mr. Wiesbrock used to measure aging accounts and that Mr. Wiesbrock consistently communicated this to Mr. Ganske beginning in 2017 and continuing in 2018 and 2019.  It was consistently Mr. Wiesbrock's expectation in his text messages and email communications with Mr. Ganske that invoices would be no more than 100 days past due.  When Mr. Wiesbrock prompted Mr. Ganske for payment on accounts older than 100 days, Mr. Ganske met those payment terms until late summer of 2019.  In reviewing his August 2019 emails, Mr. Wiesbrock credibly testified that those emails were intended to memorialize discussions between himself and Mr. Ganske about keeping the payment of accounts receivable under 100 days past due.  The evidence supports the finding that the parties' course of performance was to keep accounts receivable no more than 100 days past due.  Arguably, the parties also could be said to have modified their contract to include a term governing time of payment that involved keeping invoices under 100 days past due.  Through the conduct in making payments when Mr. Wiesbrock requested payments on accounts over 100 days old, Ganske acquiesced to this timing for payments.

Having established that OBT expected payment on accounts receivable that were 100 days past due and that Ganske routinely acquiesced to payment within that time, the question

13

becomes whether failure to pay within that timeframe constituted a material breach excusing OBT from performance under the Agreement.

Under Illinois law, the determination of whether a breach of a contract is "material" and justifies non-performance by the other party:

> is a complicated question of fact, involving an inquiry into such matters as whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage considers such a breach to be material, and whether the allowance of reciprocal non-performance by the non-breaching party will result in his accrual of an unreasonable or unfair advantage.

*Sahadi v. Continental Ill. Nat'l Bank & Tr. Co. of Chicago*, 706 F.2d 193, 196 (7th Cir. 1983) (citations omitted); *see also William Blair & Co., LLC v. FI Liquidation Corp.*, 358 Ill. App. 3d 324, 346, 830 N.E.2d 760, 779 (2005). Illinois courts also rely on the factors stated in the Restatement (Second) of Contracts in determining whether a breach is material:

> Specifically, the court should consider (1) the extent to which the injured party will be deprived of the benefit that he or she reasonably expected; (2) the extent to which the injured party can be adequately compensated for the part of that benefit of which he or she will be deprived; (3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (4) the likelihood that the party failing to perform or to offer to perform will cure his or her failure, taking account of all the circumstances, including any reasonable assurances; and (5) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Rubloff CB Machesney, LLC v. World Novelties, Inc.*, 363 Ill. App. 3d 558, 564, 844 N.E.2d 462, 467 (2006) (citing Restatement (Second) of Contracts § 241 (1981)).

Here, Ganske's breach clearly defeated the bargained-for objective of the parties, deprived OBT of the benefit it reasonably expected, and caused disproportionate prejudice to OBT. Mr. Wiesbrock stated on several occasions in his text messages and his testimony that

OBT was being "held hostage" by Ganske because Ganske had an exclusive right to use the barge terminal for the handling of fertilizer product, but Ganske was severely past due in paying OBT what it was owed for its services, and Ganske was not bringing in additional product to generate accounts for OBT. *E.g.*, Debtors' Ex. 11 at 40, 41. He further noted the significant impact Ganske's failure to pay his invoices was having on OBT as a small business with 10 to 20 full-time employees, who still needed to be paid even though Ganske was not paying OBT. He described the impact of the situation on his father's health, how his father had to borrow money to meet payroll expenses, and how OBT lost money in 2019.

When asked by Debtors' counsel whether other sources of income or revenue besides Ganske constituted at least 40% of OBT's income, Mr. Wiesbrock was unable to say. However, Mr. Wiesbrock stated that Ganske was OBT's only source of income as it related to fertilizer, which was a major part of the business. He also reviewed OBT's Balance Sheet from December 31, 2019. EuroChem Ex. 12 at 234. The balance sheet showed $259,442.03 in "Accts Receivable – Customers" and $229,538.99 in "Accts Receivable – Ag Consultants," or Ganske. Debtors' counsel observed that other customers owed OBT more than Mr. Ganske did. Significantly, though, Mr. Wiesbrock testified that the other customers' accounts receivable were current.

In sum, OBT demonstrated that Ganske's failure to pay was a material breach of the agreement between the parties. Ganske's failure to hold up its end of the bargain in paying for OBT's services greatly prejudiced OBT. Ganske breached the agreement when he failed to pay the accounts receivable with OBT that were 100 days past due and OBT properly terminated the Agreement as a result of this material breach due to nonpayment. Because the Agreement was

properly terminated before this bankruptcy was filed, there is no agreement with OBT for the Debtors to assume in this bankruptcy case.

## II. Mr. Ganske's Conduct Related to Ameropa and Swiss Singapore Did Not Breach the Agreement.

OBT also based its termination of the Agreement, as amended by the Addendum, on Ganske's actions relative to the "contractual arrangement with Ameropa" and "relating to the Swiss Singapore matter." Debtors' Ex. 4. Paragraph 3 of the Agreement permitted Ganske to use OBT's services to handle product belonging to someone other than Ganske:

> Sublease. Agricultural [Ganske] may sublease space to a third party vendor at any time during the term of this Agreement without prior approval from Warehouseman [OBT]. Agricultural and Warehouseman will treat any third party Product stored at Facility with same guidelines provided in this Agreement.

Debtors' Ex. 1, ¶ 3. Pursuant to this paragraph, Ganske arranged for OBT to receive and store Ameropa's product at its facility. Mr. Ganske testified that Ameropa tendered a prill urea barge at OBT in July 2019. He testified that it was unloaded when it should not have been unloaded because he had not paid Ameropa for the product yet. Mr. Ganske then acknowledged that he shipped out some of the product before he had paid for it. This resulted in counsel for Ameropa sending OBT a demand letter requesting that it pay $326,529.34 for the "product that was wrongfully removed, loaded and released." OBT Ex. 4 at 10.

Mr. Ganske also testified that he was going to sublease space to Swiss Singapore because of his current financial situation, using them as a partner along with Ameropa. In text messages, Mr. Wiesbrock suggested terminating the Agreement so that OBT could unload product from Swiss Singapore and Mr. Ganske would get a commission. Debtors' Ex. 11 at 39. He stated OBT could not be "held hostage by this master lease if you are not going to pay the AR." *Id.* at 41. Mr. Ganske indicated that Swiss Singapore may have made a "side deal" without him, but

16

warned, "I'm in control as they have a barge of product in my warehouse with no lease." *Id.* Mr. Wiesbrock responded that OBT would not move any of the product without direction from Swiss Singapore because "we cannot have another situation like Ameropa where we are in the middle. The last time we were naive, not so this time." *Id.* at 42. Mr. Wiesbrock testified that OBT was not sure who owned what product and OBT did not want to expose itself to liability by moving product that Mr. Ganske did not have the authority to sell.

Although understandably frustrating to OBT, it is not clear that Mr. Ganske's conduct regarding the Ameropa product or the situation with Swiss Singapore violated any term of the Agreement or a course of performance between the parties. The Agreement permitted Ganske to "sublease space" without OBT's prior approval. This is apparently what Ganske did when the Ameropa barge arrived at OBT's facility. The Agreement contained a provision granting some protections to Ganske:

> Warehouseman [OBT] guarantees and warrants that after any sale and/or transfer of the leasing or ownership rights of Facility, the purchaser or other transferee will respect and perform the obligations of Warehouseman under this Agreement from and after the date of the transfer. Warehouseman agrees to indemnify, defend, and hold harmless Agricultural [Ganske] from any damages, costs, expenses (including without limitation attorney's fees, court costs, investigatory fees and costs), liabilities, claims, suits, or proceedings that are brought against Agricultural or suffered or incurred by Agricultural due to any breach of the foregoing covenants, guarantees, or warranties of Warehouseman.

Agreement, Debtors' Ex. 1 at ¶ 18. However, OBT did not identify where in the Agreement or Addendum Ganske agreed to indemnify OBT against liability it might incur should Ganske breach an agreement with a third-party vendor.

When the parties entered the Agreement and Addendum, they did not include a term governing indemnification of OBT or any other term that would support this alleged breach as a

17

basis for termination of the Agreement and the Addendum. The Agreement incorporates "the Uniform Commercial Code relating to Warehouse Receipts and Bills of Lading," which is presumably Article 7 of the Uniform Commercial Code, but OBT has not identified any provisions of that statute that were breached by Ganske. In fact, the parties did not address Article 7 at all, either in briefing or argument. OBT's counsel's letter itself underscores the fact that the contract did not contain a bargained-for term addressing the situation with Ameropa and Swiss Singapore in mentioning "OBT being drawn into a role not contemplated when it entered into the Master Lease." Debtors' Ex. 4. Neither the terms of the Agreement nor the parties' course of performance under the terms of the Agreement offer any hints as to the representations, warranties, or agreements between the parties related to Swiss Singapore or Ameropa or the intent of the parties related to Ganske's indemnification obligations. There are no such terms in the Agreement or Addendum and there is no course of performance evidence from which such terms could be implied. Without such a term and without any such course of performance evidence from which such terms could be implied, Ganske's conduct related to Swiss Singapore and Ameropa could not have been a material breach of the contract justifying OBT's termination of the Agreement.

      IT IS THEREFORE ORDERED: the Debtors' Motion to Assume Executory Contract with Ottawa Barge Terminal, Inc. is denied.

      IT IS FURTHER ORDERED: pursuant to the discussion following the hearing, Ottawa Barge Terminal, Inc. shall file its response to the Debtors' Objection to Claim No. 13-1, if any, on or before 21 days from the date this order is entered.

#####